In the Matter of the Claims of GEORGE VINGOE et al., Respondents. BETHLEHEM STEEL COMPANY, Respondent; EDWARD CORSI, as Industrial Commissioner, Appellant.

Third Department, December 28, 1954.

*Nathaniel L. Goldstein, Attorney-General* (*Francis R. Curran* and *Wendell P. Brown* of counsel), for appellant.

*Robert M. Hitchcock* for Bethlehem Steel Company, respondent.

*Lippman Bodoff* and *Eugene N. Sosnoff* for claimants-respondents.

ZELLER, J. This appeal by the Industrial Commissioner presents for our determination these questions concerning the interpretation of subdivision 1 of section 592 of article 18 of the Labor Law (Unemployment Insurance Law): (1) Whether a suspension of benefit rights under this section, imposed because employees lost employment as a result of a strike, is terminated when plant operations are resumed and other employees return to work as a result of a Presidential order seizing the employer's

steel plant; and (2) whether the suspension imposed by this section must be in consecutive weeks or may be accumulated from successive periods of unemployment.

Subdivision 1 of section 592 of the Labor Law (Unemployment Insurance Law) provides: " 1. *Industrial controversy.* The accumulation of benefit rights by a claimant shall be suspended during a period of seven consecutive weeks beginning with the day after he lost his employment because of a strike, lockout, or other industrial controversy in the establishment in which he was employed, except that benefit rights may be accumulated before the expiration of such seven weeks beginning with the day after such strike, lockout, or other industrial controversy was terminated."

A collective bargaining agreement between the steelworkers' union and the nation's steel mills was in force during 1951, and was due to expire at the end of that year. Negotiations for a new contract failed and in December, notice of a nationwide strike was given to all steel mills. Because of the importance of the steel industry, the dispute was referred by the President to the Federal Wage Stabilization Board and commencement of the strike was deferred by the union from time to time. When these negotiations failed, notice was given to all employers on April 4, 1952, that a strike would commence on April 9, 1952.

To prevent the great damage that would result from allowing equipment subjected to extremely high temperatures to cool too rapidly, the steelworkers' union and the Bethlehem Steel Company have had since 1946, special arrangements, known as the " orderly shutdown ", to permit a gradual cooling off of the equipment during the period when a strike stops production. Because of the integrated operations, the various productive steps, dependent as they are one upon the other, cannot all commence or cease at the same time. Hence when the various operations are stopped, and then started up again, the steelworkers come off and go on the various jobs at different times depending on the particular mill in which they work.

As the various operations of the employer's plant commenced to close down on or about April 7, 1952, under the orderly shutdown arrangement, the men involved in the various operations walked off the job as it became possible to do so. However, on April 8, 1952, the day before the effective date of the strike, the President issued an Executive Order directing the Secretary of Commerce to take possession of the nation's steel mills and to keep them producing steel. Pursuant to that order, all officers and employees were directed to return to their jobs and perform

their usual duties. The claimants here, who had been employed by Bethlehem Steel Company during 1951 and 1952, could not and did not return to work on April 9, 1952, but returned only when their respective mills began operating.

On June 2, 1952, the United States Supreme Court affirmed an order of the District Court enjoining the Secretary of Commerce from proceeding under the Presidential seizure order and the strike was resumed. On July 25th, an agreement was made between the mills and the union and the men returned to work.

The Referee and the Appeal Board have held that each claimant's benefits should be suspended for seven weeks effective with the first working day falling on or after April 7, 1952, on which claimant did not perform work because of a strike, lockout or other industrial controversy and that in computing the seven weeks' suspension the days of suspension in April could be added to the later period commencing in June until the seven weeks' suspension period had expired. The Industrial Commissioner contends that the President's seizure order terminated the strike and that thereafter claimants' unemployment was due to the procedure in getting the mills reactivated. The employer claims that the claimants' unemployment after the seizure of the mills was due to the industrial controversy which did not end with the seizure order.

We find nothing in the record to require us to substitute a finding different from that made by the Appeal Board to the effect that the claimants' unemployment following the Presidential seizure order and extending until the mills in which they worked were reactivated was due to an industrial controversy. In our opinion, their unemployment was directly and proximately caused by the underlying labor controversy which existed from December, 1951, and did not end until July 25, 1952. Normal operation of the steel mills was curtailed because of the strike notice of April 4th which was brought about by the labor controversy. The Presidential seizure did not terminate the labor controversy and the claimants lost work after the seizure and until their mills were again ready for their services because of the labor controversy. Under the statute, they could not accumulate benefit rights during that period.

In its decision in the instant case, the board held that the suspension imposed under the provisions of subdivision 1 of section 592 (*supra*), must commence " with the first working day falling on or after April 7, 1952 on which each claimant did not perform work because of a strike, lockout or other industrial controversy * * * and continuing thereafter cumulatively

in each period of such unemployment until their return to work or until the seven week suspension period has expired ''. It is the contention of the Industrial Commissioner on this appeal that any suspension imposed must be served in consecutive or successive calendar weeks and may not be split up and served cumulatively or piecemeal.

However, we believe that the construction given the statute by the Appeal Board is the only one consistent with the intent of the Unemployment Insurance Law to suspend benefit rights in the early stages of unemployment due to a strike, lockout, or other industrial controversy. (*Matter of Burger* [*Corsi*], 277 App. Div. 234, affd. 303 N. Y. 654.) To lift the word '' consecutive '' from its context and to hold that it means a course or succession having no interval or break would lead to results not intended by the Legislature. It would require, as applied to the facts of this case, that (1) a full seven weeks' suspension period must be imposed following the April 4th strike notice and another full seven weeks' suspension must follow the June 2d work stoppage; or (2) a seven-week suspension period must be imposed following the April 4th strike notice, and no new suspension be imposed following June 2d.

The first interpretation would not be in the interest of employees as they would incur successive seven-week suspension periods where a single underlying industrial controversy causes successive work stoppages. Any employer could, if so inclined, practice successive seven-week lockouts with short periods between and cause unemployment insurance benefits to be denied his employees. The second alternative would permit employees to strike for a short period of time, resume work for a day or two, and then strike again and thus prevent any seven-week suspension of benefit rights. Either alternative is untenable and contrary to the policy of the State. The provision must be construed to rule out absurd and unexpected results (*Matter of Chatlos* v. *McGoldrick*, 302 N. Y. 380, 388) and this the Appeal Board has done. The word '' consecutive '', as used in this statute, should, it seems to us, be interpreted to mean *successive weeks* of unemployment caused by a strike, lockout, or other industrial controversy.

The decision should be affirmed, without costs.

Foster, P. J., Bergan, Coon, and Halpern, JJ., concur.

Decision of the Appeal Board affirmed, without costs.